IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 4:22-cv-737 |
| ) | |
| CHEVRON PHILLIPS CHEMICAL ) | |
| COMPANY LP, ) | |
| ) | Judge Alfred H. Bennett |
| ) | |
| Defendant. ) | |

**PLAINTIFF'S UNOPPOSED MOTION TO ENTER CONSENT DECREE,
<u>INCLUDING MEMORANDUM IN SUPPORT</u>**

**TABLE OF CONTENTS**

I. NATURE AND STAGE OF PROCEEDINGS………………………………………….…..1
II. STATEMENT OF ISSUES AND STANDARD OF REVIEW………………………..2
III. SUMMARY OF THE ARGUMENT…………………………………………………………..2
IV. BACKGROUND……………………………………………………………………………3
    A. Factual Background………………………………………………………………3
        1. Flares and combustion efficiency…...…………………………………...3
    B. Legal Background……………………………………………………………4
        1. New Source Review…………………………………………………….4
        2. New Source Performance Standards and
           National Emissions Standards for Hazardous Air Pollutants…..………...5
        3. State Implementation Plans………………………………………………..6
        4. "Title V" operating permits………………………………………………7
    C. The Complaint……………………………………………………………………7
        1. Claims 1 and 2: New Source Review violations and failure to
           obtain Title V permits that include all "applicable requirements"………..7
        2. Claim 3: Failure to Monitor to Ensure Flares are Operated and
           Maintained in Conformance with their Design...…………..…………….8
        3. Claim 4: Failure to Operate Flares Consistent with
           Good Air Pollution Control Practices...……………….…..……..…..…..8
        4. Claim 5: Combusting Gas with a NHV Less Than 300
           BTU/scf…………………………………………………………..…..…9
V. MAJOR TERMS OF THE CONSENT DECREE……………………………………….9
    A. Summary of Required Injunctive Relief……………………………………….9
    B. Civil Penalty ……………………………………………………………………..10
    C. Other Consent Decree Requirements……………………………………………10
VI. STANDARD OF REVIEW…………………………………………………………….....11
VII. ARGUMENT…………………………………………………………………………………12
    A. The Consent Decree is Fair, Adequate, and Reasonable………...……………12
        1. The Consent Decree was negotiated at arms-length
           and in good faith………………………………………………………..12
        2. The stringent relief required holds the Defendant accountable for its
           alleged Clean Air Act violations………………………………………13
        3. The Consent Decree achieves strong results
           without protracted litigation……………………………...……………..14
    B. The Consent Decree Furthers the Purposes of the Clean Air Act………………..15
VIII. CONCLUSION………………………………………………………………………..16

The United States of America ("United States"), on behalf of the United States Environmental Protection Agency (the "EPA"), with the consent of Defendant Chevron Phillips Chemical Company LP ("Defendant"), moves this Court to approve and enter the Consent Decree between the United States and Defendant (ECF No. 2-1). (A copy of the Consent Decree (alternatively, "CD") is being filed with this Motion as Exhibit 1.)

As shown below, the Consent Decree is fair, adequate, reasonable, and consistent with the objectives of the Clean Air Act (the "CAA" or "Act"), 42 U.S.C. §§ 7401 *et seq.*, thus meets the standards for approval and entry, and should be entered by the Court as a final judgment.

## I. NATURE AND STAGE OF PROCEEDINGS

The United States filed a Complaint (ECF No. 1 (alternatively, "Compl.")) in this action seeking injunctive relief and civil penalties from Defendant on March 9, 2022, for alleged violations of the CAA with respect to emissions of volatile organic compounds ("VOCs"), hazardous air pollutants ("HAPs"), and other pollutants at the Defendant's chemical manufacturing facilities located in or near Cedar Bayou, Texas; Port Arthur, Texas; and Sweeny, Texas (collectively, the "Covered Plants").

The Complaint alleges violations of the CAA, regulations promulgated pursuant to that statute, and operating permits that incorporate the statutory and regulatory requirements. *See generally* Compl. More specifically, the Complaint alleges Defendant improperly operated, maintained, monitored, and controlled flares used at three petrochemical manufacturing facilities. *See id.* ¶ 2. As a result of the Defendant's alleged violations, thousands of tons of air pollution were illegally emitted. *See id.* ¶ 3.

Concurrently with filing the Complaint, the parties lodged the proposed Consent Decree to resolve all claims alleged in the Complaint. *See* CD § XIII, ¶ 95. Notice of the proposed Consent Decree was published in the Federal Register, 87 Fed. Reg. 14576 (March 15, 2022) and public comments were solicited in accordance with Department of Justice policy, 28 C.F.R. § 50.7, and Paragraph 119 of the Consent Decree. The notice described the principal terms of the settlement and provided a thirty-day opportunity for the public to comment on the proposed Consent Decree. The United States received no public comments on the Consent Decree

## II.  STATEMENT OF ISSUES AND STANDARD OF REVIEW

The sole issue to be decided is whether the Consent Decree satisfies the Fifth Circuit's deferential standard of review for such voluntary settlements and, therefore, should be entered as a final judgment in this matter.

As discussed further in Section VI, in order to approve the Consent Decree, this Court need only determine that the settlement is fair, adequate, reasonable, and consistent with the objectives of the statute at issue. *See Cotton v. Hinton*, 559 F.2d 1326, 1330-31 (5th Cir. 1977).

## III.  SUMMARY OF THE ARGUMENT

The Consent Decree satisfies the Fifth Circuit's deferential standard of review for such voluntary settlements and should be entered by the Court. The settlement is fair, adequate, reasonable, and consistent with the purposes of the CAA. *See Cotton*, 559 F.2d at 1330-31. The suite of injunctive relief the Defendant must perform holds it accountable for its alleged violations, prevents similar violations in the future, and mitigates the past effects of its alleged non-compliance. Far less air pollution will be emitted from the flares covered by the settlement

as a result. The injunctive relief is estimated to cost $118 million. CD (page 3). In addition, the Defendant must pay $3.4 million in civil penalties. All of these terms were negotiated by experienced counsel for the parties at arms-length and in good faith. Furthermore, as noted above, no public comments regarding the Consent Decree were received during the thirty-day period for soliciting public comments.

Pursuant to Local Rule 7.1, the parties conferred in good faith regarding this motion and its requested relief. Defense counsel authorized the United States to represent that this motion is unopposed and that they consent to entry of the Consent Decree. In addition, pursuant to the terms of the Consent Decree, the Defendant consents to its entry without further notice. *See* CD § XXI, ¶ 119.

The parties now request that the Consent Decree be entered as a final judgment in this matter.

### IV. BACKGROUND

A. <u>Factual Background</u>

1. <u>Flares and combustion efficiency</u>

Flares are used to control air pollution generated by industrial operations like petrochemical manufacturing and petroleum refining. *See* Compl. ¶ 89. The Defendant, like other petrochemical manufacturers, uses flares that are elevated high off the ground and use an open-air flame to combust and destroy harmful constituents of the waste gases generated by its operations. *See id*. ¶¶s 11-14, 89-94. These constituents include ozone-forming VOCs, HAPs, and other air pollutants. *See id*. ¶¶s 99-101. Because they are used to control these types of

harmful pollutants, flares must be carefully monitored, operated, and maintained so that they continuously achieve a high "combustion efficiency."[1] *See id*. ¶¶s 95-99.

In order to promote good combustion efficiency, flares are often "assisted" by injecting steam (via piping or nozzles) into the base of a flare's flame. *See id*. ¶ 93. Injecting "assist steam" *within certain ranges* aids combustion by promoting turbulence within a flare's flame and entraining ambient air into the combustion zone. *See id*. ¶¶s 95-96, 99.

Steam-assisted flares must therefore be operated within a fairly narrow range of ratios of assist steam to the gases that are sent to flares for combustion. *See id*. ¶¶s 95-96, 99. Too little assist steam, and a flare will emit smoke. *See id*. ¶¶s 96. The waste gases will not be sufficiently mixed in the flame, will not be effectively combusted, and will consequently be emitted as (oftentimes visible) residual soot or smoke. *See id*. Conversely, too much assist steam (referred to as "over-steaming") also has negative effects. Over-steaming quenches the flame, either partially or completely. *See id*. ¶ 98. The ultimate effect of over-steaming is that unburned VOCs and HAPs are emitted to the air, instead of being combusted. *See id*. ¶¶s 3 and 96, 98-99.

B. Legal Background

Flares trigger different CAA (and comparable state law) requirements based on their dual nature as both a source of air pollution and a control device for air pollution.

1. New Source Review

The Defendant's petrochemical plants, and the flares that they use, emit a category of CAA pollutants known as "criteria [air] pollutants."[2] *See* Compl. ¶ 15. For example, the

---

[1] Combustion efficiency measures how completely the carbon-containing molecules within waste gases are reacted to form carbon dioxide ("$CO_2$") and water. *See* CD § III, ¶ 12(l).

4

Defendant's flares emit VOCs and NOx which, together, act to form ground-level ozone. *See id.*; *see also* 40 C.F.R. §§ 50.9-50.11.

The CAA's New Source Review requirements, in summary, prohibit the construction or major modification of major stationary sources of criteria pollutants if those activities will significantly increase emissions of those air pollutants. *See generally* CAA, Subchapter I, Part C (Prevention of Significant Deterioration ("PSD") requirements) and Part D (Non-attainment New Source Review requirements),³ 42 U.S.C. §§ 7470–7492 and 7501-7515. Before undertaking construction or major modifications that will result in a significant net emissions increase of criteria air pollutants, the owner or operator of the source – here, the Defendant – must obtain an appropriate permit, which, among other things, requires strict air pollution control limits. *See* 42 U.S.C. § 7475(a) (requiring limits based on the best available control technology ("BACT") in PSD areas); *see also* 42 U.S.C. § 7501(3) (requiring limits based on the lowest achievable emission rate ("LAER") in non-attainment areas).

  2.  New Source Performance Standards and
      National Emissions Standards for Hazardous Air Pollutants

In addition to being regulated as sources of air pollution, flares are regulated in their capacity as air pollution control devices. The Defendant's flares are used for this purpose and, must comply with monitoring and operating requirements under the CAA's New Source

---

² "Criteria pollutants" refers to a set of air pollutants that: a) are emitted from numerous or diverse mobile or stationary sources of air pollution, and b) may endanger public health or welfare through their emissions. *See* 42 U.S.C. § 7408(a). The CAA requires the EPA to identify and prepare air quality standards for criteria pollutants. *See id.* These air quality criteria are known as National Ambient Air Quality Standards ("NAAQS"). *See id.*

³ The CAA's PSD program seeks to prevent the deterioration of air quality in designated areas that meet the NAAQS. *See* 42 U.S.C. § 7407(d); *see also* 42 U.S.C §§ 7470-7471. Non-attainment New Source Review requirements apply in areas that do not meet NAAQS for a particular criteria pollutant. *See* 42 U.S.C. § 7407(d).

Performance Standards ("NSPS") and National Emissions Standards for Hazardous Air Pollutants ("NESHAP") regulations. *See* Compl. ¶¶s 42-75. For example, the Defendant's flares must:

- Be designed and operated with no visible emissions (*i.e.*, no smoking);

- Be operated with a flame present at all times;

- Flare only gas with a net heating value ("NHV") of at least 300 British Thermal Units per standard cubic foot ("BTU/scf");

- Be monitored to ensure operation and maintenance in conformance with their design; and

- Be operated at all times when emissions are vented to them.

*See generally* 40 C.F.R. §§ 60.18(c)-(e) and 63.11(b)(1)-(6).

Companies must also use "good air pollution control practices" to minimize emissions from the affected sources and their associated air pollution control equipment. *See* 40 C.F.R. §§ 60.11(d), 61.12(c), and 63.6(e)(1)(i). Good air pollution control practices for flares include monitoring and operating them in order to ensure that they achieve high combustion efficiency of the waste gases sent to them. *See* Compl. ¶¶s 95-99.

### 3. State Implementation Plans

The Act requires each state to develop a plan detailing how it will attain and maintain NAAQS within the state. *See* 42 U.S.C. § 7410(a). This plan is known as a State Implementation Plan ("SIP"). The SIP, which is embodied in state-issued regulations, is federally enforceable once the EPA approves it. NSPS and NESHAP regulations, or similar versions of them, may be part of SIPs. SIPs may also contain requirements that are unique to the individual state.

4. "Title V" operating permits

Sources of air pollution like the Defendant's petrochemical plants must also obtain a CAA "Title V" operating permit. *See* 42 U.S.C. § 7661a(a). The purpose of a Title V operating permit is to ensure that all "applicable requirements" governing a facility's compliance with the CAA, including SIP requirements, are consolidated and expressed in one document. *See* 42 U.S.C. § 7661c(a). Applicable requirements may include New Source Review requirements, NSPS, and NESHAPs. *See* 40 C.F.R. § 70.2. Sources may not operate except in compliance with a valid Title V permit. *See* 42 U.S.C. § 7661a(a).

C. The Complaint

The Complaint alleges five claims seeking injunctive relief and civil penalties for the Defendant's violations of the CAA and Texas SIP. *See generally* Compl. ¶¶s 130-173.

1. Claims 1 and 2: New Source Review violations and failure to obtain Title V permits that include all "applicable requirements"

The Complaint alleges that the Defendant modified its petrochemical plants in ways that triggered the CAA's New Source Review requirements. *See* Compl., First Claim for Relief (pages 27-29). These changes allowed the Defendant's flares to receive and combust more waste gas, which resulted in significant net emissions increases of criteria pollutants like VOCs and NOx. *See id*. The Defendant, however, never applied for the proper New Source Review permits for these modifications, never installed the required pollution control technology ("BACT" or "LAER"), and never complied with other applicable New Source Review requirements, such as obtaining emission offsets for non-attainment areas. *See id*. The Defendant also failed to obtain, and operate in accordance with, Title V permits that include applicable New Source Review requirements. *See id*., Second Claim for Relief (pages 29-31).

7

2. Claim 3: Failure to Monitor to Ensure Flares are Operated and Maintained in Conformance with their Design

The Complaint asserts the Defendant failed to perform several actions that must be taken to monitor steam-assisted flares to ensure that they are operated and maintained in conformance with their design. *See* Compl. (pages 31-32); *see also* 40 C.F.R. §§ 60.18(d) and 63.11(b)(1). The Defendant failed to install and properly operate monitors to measure the flow of vent gas and assist steam to the flares. The Defendant failed to calculate steam-to-vent gas ratios ("S:VG"). The Defendant also failed to have sufficient controls on the flow of assist steam to actively (*i.e.*, in close to real-time) increase or decrease steam-to-vent gas ratios. Without these actions, it is impossible to maintain the proper S:VG ratios (*i.e.*, the narrow range of S:VG ratios that will achieve good combustion efficiency). *See* 40 C.F.R. § 63.172(e) (noting that the intent of this monitoring requirement "is to ensure proper operation and maintenance of the control device").

3. Claim 4: Failure to Operate Flares Consistent with Good Air Pollution Control Practices

The Complaint alleges the Defendant failed to operate its flares using good air pollution control practices for minimizing emissions. *See* 40 C.F.R. §§ 60.11(d), 61.12(c), and 63.6(e)(1)(i). The Defendant operated most of its flares with excessively high S:VG ratios. This oversteaming led to poor combustion efficiency. *See* Compl., Fourth Claim for Relief (pages 32-35). Operating with excessively high S:VG ratios increases the likelihood of flame quenching or snuffing, reduces flare combustion efficiency, and results in excessive emissions from the flares.

Second, the Defendant failed to install, or failed to use, the monitoring equipment needed to monitor and maintain a proper steam-to-vent gas ratio in order to ensure good combustion efficiency. The Defendant also failed to add supplemental gas quickly enough or in sufficient

8

amounts to maintain proper S:VG ratios. Without these actions, it is impossible to maintain the proper S:VG ratios and consistently achieve good combustion efficiency.

4. Claim 5: Combusting Gas with a NHV Less Than 300 BTU/scf

The Complaint alleges further that the Defendant violated NSPS- and NESHAP-required operating practices by combusting gas that had a NHV of less than 300 BTU/scf in one of more of the Cedar Bayou, Port Arthur, and Sweeny Flares. *See* Compl., Fifth Claim for Relief (pages 35-36).

## V. MAJOR TERMS OF THE CONSENT DECREE

A. Summary of Required Injunctive Relief

The Consent Decree's compliance requirements will eliminate thousands of tons of air pollution from flares used across three chemical manufacturing facilities, including ozone-forming VOCs, HAPs, and greenhouse gases. Among the requirements, the Defendant will install (or will improve the operation of existing) flare gas recovery systems—waste gas recovery technology—that will reduce flaring at its three facilities. CD § V. The Defendant must implement a Waste Gas Minimization Plan to minimize or eliminate flaring. CD ¶ 28-31. The Defendant is required to abide by volumetric flow caps limiting the volume of gas that can be flared at its olefins flares at the Port Arthur and Sweeney facilities. CD ¶ 36-37. And the Defendant will install state-of-the-art instrumentation and equipment at all three facilities to ensure that flaring that does occur achieves 98% combustion efficiency. CD § V.A, ¶¶s 18-26, 44.

The Defendant must also install and operate a set of ambient air monitors that would sample for benzene along the fenceline perimeter of each Facility. CD ¶ 47 and Appendix 2.2. If

during a sampling period, a benzene exceedance occurs, the Defendant would be obligated to conduct a root cause analysis and corrective action as necessary. CD Appendix 2.2, ¶ 3(f)-(h). Monitoring results and details on root cause/corrective action would be published on a public website providing the neighboring communities with more information about their air quality. *Id*. The injunctive relief is estimated to cost $118 million. CD (page 3).

      B.      <u>Civil Penalty</u>

In addition to the injunctive relief described above, the Defendant will pay $3.4 million in civil penalties. *See* CD § IV, ¶ 13. This penalty provides a strong deterrent against similar future CAA violations at the Defendant's facilities and is otherwise appropriate in light of the factors considered in assessing civil penalties under the CAA. *See, e.g.*, 42 U.S.C. § 7413(e)(1) (penalty assessment criteria).

      C.      <u>Other Consent Decree Requirements</u>

The Consent Decree also requires the Defendant to:

- Incorporate select standards and limits required by the Consent Decree into federally enforceable, non-Title V permits that would ensure that the standards and limits survive termination of the Consent Decree. CD ¶¶ 49.c and 115 d-e.

- Not use any of the emissions reductions generated by this settlement for other purposes. *Id*. ¶ 52.

- Limit how emissions reductions generated by this settlement may be used. *Id*. § VII;

- Submit detailed semi-annual compliance status reports so that the United States can monitor compliance with the Consent Decree. *Id*. § VIII; and

- Be subject to stipulated penalties for violations of the Consent Decree. *Id*. § IX.

## VI. STANDARD OF REVIEW

To support entry, this Court's review need only determine that the settlement embodied in the Consent Decree is "fair, adequate, and reasonable," *Cotton*, 559 F.2d at 1330, as well as consistent with the objectives of the statutes under which the action was brought. *United States v. City of Miami*, 664 F.2d 435, 441 (5th Cir. 1981) (Rubin, J., concurring). "The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy." *Id*. at 441 n.13. Although the court does not act simply as a "rubberstamp" for such settlements and is entitled to analyze the facts and law relevant to the proposed compromise, the court should not "substitute its judgment for that of the parties to the decree." *United States v. Wallace*, 893 F. Supp. 627, 631 (N.D. Tex. 1995) (citation omitted); *see also Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984) (citing *Cotton*, 559 F.2d at 1329). "The test is not whether this Court would have fashioned the same remedy nor whether it is the best possible settlement." *United States v. BP Expl. & Oil Co.*, 167 F. Supp. 2d 1045, 1050 (N.D. Ind. 2001). And the Court is not empowered to rewrite a settlement agreed upon by the parties. *See Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 630 (9th Cir. 1982). The Court must consider the Consent Decree "as a whole and as submitted." *See id*.

This deferential standard of review promotes a "public policy strongly encourag[ing] the settlement of cases." *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547 n.2 (5th Cir. 1988). The presumption in favor of voluntary settlements is "particularly strong where a consent decree has been negotiated by the Department of Justice on behalf of a federal administrative agency like EPA which enjoys substantial expertise in the environmental field." *United States v. Akzo*

*Coatings of Am., Inc.*, 949 F.2d 1409, 1436 (6th Cir. 1991) (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)); *see also Wallace*, 893 F. Supp. at 631. Only a finding that the Consent Decree is a product of "fraud, collusion, or the like" should preclude its entry. *Cotton*, 559 F.2d at 1330.

## VII.  ARGUMENT

The Consent Decree and the settlement it reflects are fair, adequate, and reasonable, as well as consistent with the public health and environmental protection goals of the CAA and Texas. The Consent Decree should therefore be approved and entered as a final order of the Court.

### A.  The Consent Decree is Fair, Adequate, and Reasonable

The Consent Decree is both procedurally and substantively fair. *See Cannons*, 899 F.2d at 86 (explaining that "fairness in the . . . settlement context has both procedural and substantive components"). Procedural fairness considers the "candor, openness, and bargaining balance" of the negotiation process. *See Wallace*, 893 F. Supp. at 632. "Substantive fairness concerns concepts of corrective justice and accountability." *Id*. Substantive fairness is related to procedural fairness because "[t]o the extent that the process was fair and full of 'adversarial vigor,' the results come before the court with a much greater assurance of substantive fairness." *Cannons*, 899 F.2d at 87 n.4 (citation omitted).

#### 1.  The Consent Decree was negotiated at arms-length and in good faith

The proposed Consent Decree is the result of a fair process of arms-length negotiations that were conducted in good-faith over a period of many years. All parties had experienced legal and technical representatives present throughout the negotiations who vigorously advocated their

respective positions. The United States was represented by attorneys and technical staff from the Department of Justice and the EPA's Washington, D.C.-based Air Enforcement Division. The Defendant were similarly represented by both experienced in-house and outside legal counsel, as well as technical personnel. In reviewing and approving the Consent Decree, additional senior representatives of the Department of Justice, the EPA, and Defendant ultimately determined that the Consent Decree is fair. The fact that "affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in a judicial decree" itself favors a finding that this settlement is the result of a fair process. *See Cannons*, 899 F.2d at 84.

        2.     <u>The stringent relief required holds the Defendant accountable for its alleged Clean Air Act violations</u>

Under the Consent Decree, the Defendant will be held accountable for its alleged non-compliance. *See Cannons*, 899 F.2d at 87 (explaining that "a party should bear the cost of the harm for which it is legally responsible"). The array of injunctive relief described above serves to prevent similar non-compliance at the Defendant's facilities in the future. The relief will also help mitigate the effects of the Defendant's past alleged violations by reducing air pollution in the surrounding communities. In addition, the Defendant will pay a substantial civil penalty for its violations. *See Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 531 (5th Cir. 2008) (noting penalty in consent decree "represents the federal government's discretionary resolution of the level of penalty needed"). Lastly, the Defendant is subject to a stringent set of stipulated penalties that holds it accountable for its future performance under this settlement. *See* CD § IX (Stipulated Penalties). These requirements assure that the Consent Decree satisfies the standards of accountability and corrective justice required for entry.

### 3. The Consent Decree achieves strong results without protracted litigation

Entry of the Consent Decree serves the public interest by securing its results more quickly and at less cost than could be achieved through litigation. The likely alternative to the proposed settlement would be protracted complex litigation that would expend limited governmental and judicial resources. *See BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1053 (acknowledging the government's and courts' limited resources).

Of course, like any settlement, the Consent Decree is the product of compromise in which, "in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation." *United States v. City of Jackson*, 519 F.2d 1147, 1152 (5th Cir. 1975) (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971)). But, "[t]he trial court should not make a proponent of a proposed settlement 'justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained; inherent in compromise is a yielding of absolutes and an abandoning of highest hopes.'" *Cotton*, 559 F.2d at 1330 (quoting *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y. 1972)). Furthermore, courts should be sensitive to the "resources consumed by the federal agencies in negotiating these [settlements], as well as the chance justly to finalize a matter that otherwise would burden agencies and courts." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 851 (5th Cir. 1975). Resolving a controversy through consent is valuable precisely because it avoids "a protracted examination of the parties' legal rights." *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983).

It is inherently uncertain whether protracted litigation would secure the same stringent injunctive relief and penalty as recovered under the Consent Decree. The United States believes

that it has strong claims against the Defendant. The Defendant disagrees. It believes that it has viable defenses to the United States' claims. The United States must consider the risk that it will not prevail on its claims or that the Court could order less protective controls. The Consent Decree reflects the parties' careful and informed assessment of the relative merits of each other's claims while taking into consideration the risks, costs, and time inherent in litigating a case of this magnitude. The Consent Decree reflects a reasonable compromise of the risks facing the United States if forced to litigate this matter. Yet it holds the Defendant accountable for its conduct and delivers results immediately. *See Akzo Coatings*, 949 F.2d at 1436 n.25 (quoting *United States v. Hooker Chems. & Plastics Corp.*, 540 F. Supp. 1067, 1080 (W.D.N.Y. 1982)), ("[w]eighing strongly in favor of approval is the fact that the plan can be implemented immediately"). Accordingly, the Consent Decree is fair, adequate, reasonable, and in the public interest.

      B.      <u>The Consent Decree Furthers the Purposes of the Clean Air Act</u>

The Consent Decree also comports with the public health and environmental goals of the CAA, *See BP Expl. & Oil Co.*, 167 F. Supp. 2d at 1054 (explaining that the "most important factor as to public policy is whether the decree comports with the goals of Congress" (quoting *Sierra Club v. Coca–Cola Corp.*, 673 F. Supp. 1555, 1556 (M.D. Fla. 1987)). The Consent Decree unquestionably secures prompt and appropriate environmental benefits by requiring the Defendant to take immediate steps to reduce emissions of the air pollutants at issue in the United States' claims. Thousands of tons of harmful air pollution will be eliminated each year as a result. *See* CD (page 3). The Consent Decree, thus, helps to "protect and enhance the quality of the Nation's air resources" – a primary objective of the CAA. *See* 42 U.S.C. § 7401(b)(1).

Because of the Consent Decree, these benefits will accrue without litigation delays or costs. *See Aro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976) (public interest furthered by voluntary settlement that secures a "speedy and reasonable remedy for the dispute"). This settlement furthers the goals of the Clean Air Act, and it is in the public interest.

## VIII.  CONCLUSION

The United States respectfully requests that the Court grant this motion, **sign page 86** of the Consent Decree attached as Exhibit 1 to the this Unopposed Motion to Enter Consent Decree Including Memorandum in Support, and enter it as a final judgment in this matter.

Dated:  April 29, 2022                              Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

Attorney-in-Charge:                              *s/ Thomas P. Carroll*
THOMAS P. CARROLL
District of Columbia Bar No. 388593
Assistant Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Tel: 202-514-4051
thomas.carroll@usdoj.gov

JENNIFER B. LOWERY
United States Attorney
Southern District of Texas

|  |  |
|---|---|
| Local Co-counsel: | JIMMY A. RODRIGUEZ<br>Senior Litigation Counsel<br>Assistant United States Attorney<br>Southern District of Texas<br>Texas Bar No. 24037378<br>Federal ID No. 572175<br>1000 Louisiana, Suite 2300<br>Houston, Texas  77002<br>Tel: (713) 567-9532<br>Fax: (713) 718 3303<br>jimmy.rodriguez2@usdoj.gov |

OF COUNSEL:
Robert Parrish, Attorney-Advisor
Air Enforcement Division, Office of Civil Enforcement
United States Environmental Protection Agency, HQ
Mail Code 2242A
1200 Pennsylvania Avenue, N.W.
Washington, DC  20460

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2022, a true and correct copy of the foregoing PLAINTIFF'S UNOPPOSED MOTION TO ENTER CONSENT DECREE, INCLUDING MEMORANDUM IN SUPPORT was filed with the Clerk of the U.S. District Court for the Southern District of Texas using the Court's CM/ECF system. Notice of this Electronic Filing will be sent to all parties by operation of the Court's Electronic Filing System. In addition, a true and correct copy of the foregoing was served on counsel for the Defendant by mailing a copy, first class postage prepaid to the following:

| | |
|---|---|
| Rob Brager<br>Beveridge & Diamond PC<br>201 North Charles Street, Suite 2210<br>Baltimore, MD 21201 | Madeleine Boyer<br>Beveridge & Diamond PC<br>400 West 15th Street, Suite 1410<br>Austin, TX 78701 |

s/ *Thomas P. Carroll*
Thomas P. Carroll